ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
    – and –
TRAVIS E. DOWNS III (148274)
BENNY C. GOODMAN III (211302)
ERIK W. LUEDEKE (249211)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
travisd@rgrdlaw.com
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

SHUMAN, GLENN & STECKER
KIP B. SHUMAN (145842)
100 Pine Street, Suite 1250
San Francisco, CA 94101
Telephone: 303/861-3003
303/536-7849 (fax)
kip@shumanlawfirm.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NICHOLAS R. INGRAO, Derivatively on Behalf of YELP INC., <br><br> Plaintiff, <br><br> vs. <br><br> JEREMY STOPPELMAN, CHARLES "LANNY" BAKER and JOSEPH R. "JED" NACHMAN, <br><br> Defendants, <br><br> – and – <br><br> YELP INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY, UNJUST ENRICHMENT AND VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action on behalf of nominal defendant Yelp Inc. ("Yelp" or the "Company") to protect and preserve its valuable claims for contribution, damages, and other relief against defendants Jeremy Stoppelman ("Stoppelman"), Charles "Lanny" Baker ("Baker"), and Joseph R. "Jed" Nachman ("Nachman") (together, "defendants").  Defendants serve, or previously served, as senior executives of Yelp.

2.      As 2017 unfolded, the defendants engaged in an unlawful scheme designed to materially mislead Yelp shareholders about the purported success of the Company's business and advertising model and its prospects for future revenue and earnings growth.  This scheme, which involved defendants making materially false and misleading public statements in their official capacity as Yelp senior officers, severely damaged the Company by exposing it to liability for violating the federal securities laws.  Defendants' false and misleading statements were made in breach of their non-exculpable fiduciary duties of loyalty and good faith.

3.      Worse yet, while in possession of adverse material non-public information about the Company's business and actual prospects for growth, defendant Stoppelman sold substantial amounts of his personal Yelp stockholdings.  As described further herein, defendant Stoppelman's stock sales were suspicious both in their timing and their amount.

4.      Yelp was founded in 2004 and provides crowd-sourced reviews of local businesses, primarily through its website at Yelp.com and via the Yelp mobile app.  Yelp makes money by selling ads to local businesses that are displayed to the consumers who search Yelp for reviews and information about local businesses.

5.      Yelp derives substantially all of its revenue from the display of advertising products on its website and mobile app.  For example, advertising revenue accounted for 91% of the Company's $846 million in 2017 revenue.  Given the Company's heavy reliance on advertising, the

rate at which the Company can retain and keep advertisers is of vital importance to the Company's bottom line and, consequently, its shareholders.  This is why, in the Company's filings with the SEC and in earnings calls and other public statements, defendants continuously emphasized the Company's retention rate for advertisers.

6.      Starting in 2015, Yelp began moving from a cost-per-impression ("CPM") system to a cost-per-click ("CPC") advertising system.  The former CPM system charged Yelp advertisers a predetermined fee for every 1,000 advertisements shown, whereas the CPC system charged Yelp advertisers only when users clicked their advertisements.  Under the CPC system, Yelp receives revenue every time a user clicks on an advertisement and, thus, the Company benefits more when advertisements achieve a high level of user engagement.

7.      In an effort to increase sales and user engagement under the new advertising model, defendants made local business advertising a top priority for 2016 and substantially increased the Company's salesforce.  Defendants frequently represented to Yelp shareholders and the investing public that the Company's local business advertising was performing well due to the efforts underlying the new push for local business advertising.

8.      Indeed, throughout 2016, defendants emphasized the high retention levels for advertisers and reassured investors that these results were extremely precise due to the Yelp Insiders' access to real-time performance metrics.  And during a February 9, 2017 earnings call, defendant Stoppelman represented that the Company had a "strong, embedded client base," while defendant Baker explained that "80% of [advertisers] are saying, I am repeating."  In fact, defendants made numerous similar statements emphasizing high levels of advertiser retention.  But the truth was a very different story.

9.      In reality, from 2016 into early 2017, the Company was experiencing weak revenue retention in its local advertising business.  Defendants knew that overall local business revenue

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

churn was high among advertisers, but that churn was especially pronounced with accounts added during the first quarter of 2016. This churn was generated because many of the local business advertisers added during the first quarter of 2016 were experiencing low user engagement under the new CPC advertising system. Given the low user engagement and the fact that many of these same advertisers were only subject to short-term contracts (typically with a term of only 12 months), many advertisers were leaving Yelp's advertising platform.

10.     While Yelp discouraged early contract terminations by imposing substantial fees for early termination, the local business advertisers who signed up in early 2016 would be able to cancel their contracts in late 2016 and in the first quarter of 2017, when their short-term contracts expired without being subject to termination fees. Thus, Yelp's advertising policies created a mass of local advertisers who were highly likely to cancel their contracts in late 2016 and early 2017 due to low customer engagement under the new CPC advertising system.

11.     Starting in early 2017, however, defendants engaged in an unlawful scheme designed to artificially inflate the trading price of Yelp's common stock and, in turn, the Company's market capitalization. To achieve their objective, defendants issued a series of positive – albeit false and misleading – statements on February 9, 2017, February 14, 2017, and March 1, 2017 in which they touted the purported strength of Yelp's advertising business and the resulting revenue growth and customer retention that the Company supposedly enjoyed as a result of its new push to bring in more local business advertising under the new CPC advertising system. In response to defendants' false statements, shares of Yelp common stock traded for as much as $35.85 per share during this time period, before the truth would eventually be revealed in May 2017. While Yelp common stock traded at artificially inflated prices, defendant Stoppelman sold 750,000 shares of his personal holdings of Yelp stock between February 16, 2017 and March 15, 2017, at prices as high as $35.69 per share, for unlawful insider trading proceeds of over $25.6 million.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

12.     Defendants' scheme continued unabated until early May 2017.  Then, on May 9, 2017, Yelp issued a press release announcing its financial results for the first quarter of 2017 and slashing its 2017 revenue guidance from a range of $880-$900 million to a range of $850-$865 million, and its 2017 guidance for adjusted earnings before interest, tax, depreciation and amortization ("EBITDA") from a range of $150-$165 million to a range of $130-$145 million. Defendants attributed the Company's adverse financial results and guidance to the churn of advertisers in the first quarter of 2017, which defendants had anticipated and had sought to conceal by repeatedly emphasizing Yelp's high retention numbers.

13.     Following the issuance of the Company's decreased 2017 guidance, Yelp's stock price plummeted from $34.70 per share on May 9, 2017 to as low as $26.93 per share on May 10, 2017 before closing at $28.33 per share – a drop of 18% – wiping out more than $500 million in shareholder equity.

14.     Based on these events, on or about January 18, 2018, a securities class action complaint was filed in this Court against Yelp and the defendants on behalf of a class of investors who purchased Yelp shares between February 10, 2017 and May 9, 2017 (the "Class Period").  *See Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC (N.D. Cal.) (the "Securities Class Action").

15.     The Securities Class Action specifically challenged defendants' false and misleading public statements on February 9, 2017, February 14, 2017, and March 1, 2017.  On November 27, 2018, the defendants' motion to dismiss the Securities Class Action was denied (in part), and the Securities Class Action remains pending.  In ruling on the defendants' motion to dismiss, this Court concluded that it had been adequately alleged in the Securities Class Action that certain statements issued by the Yelp Insiders on February 9, 2017, February 14, 2017, and March 1, 2017 were materially false and misleading.

16.     This Court further concluded that defendants' own public statements regarding when they became aware of the churn issues, defendant Stoppelman's insider stock sales during the Class Period, and allegations that local advertising is a "core operation" for Yelp gave rise to a strong inference of scienter on the part of defendants.  Stated another way, this Court found there was *indicia* that defendants perpetrated a damaging scheme to defraud during the Class Period.[1]

17.     By lying to shareholders, defendants breached their fiduciary duties of care, good faith, and loyalty.  Defendants also severely damaged the Company by exposing it to liability for violating the federal securities laws, because defendants made materially false and misleading public statements in their official capacity as Yelp officers.[2]  Unlike the case with directors, in their capacity as officers of the Company, defendants are not exculpated from liability for duty of care or duty of loyalty breaches.  Nor are their breaches of care and loyalty insulated from liability under the business judgment rule.

18.     This notwithstanding, however, Yelp, acting by and through its Board of Directors, has taken no remedial action whatsoever against defendants.  Instead, the Company has funded defendants' defense of the sustained securities fraud claims brought against them in the Securities Class Action.  These payments have damaged and continue to damage Yelp.

19.     On March 11, 2019, plaintiff issued a formal written pre-suit demand under Delaware law (the "Demand") to Yelp's Board of Directors (the "Board").  Therein, plaintiff demanded that Yelp, acting by and through its Board, take critical steps to preserve and protect the Company's valuable claims against defendants.  Specifically, plaintiff demanded: (i) that the Board cause Yelp to "file a Complaint for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, and

---

[1]     On December 17, 2018, defendants filed a motion for leave to file a motion for reconsideration of the Court's November 27, 2018 order sustaining the Securities Class Action.  The motion for leave to file for reconsideration was denied by this Court on January 22, 2019.

[2]     Defendant Stoppelman was at all relevant times, and is currently, both an officer and a director of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 5

aiding and abetting breaches of fiduciary duties, contribution and indemnification against [defendants] in the United States District Court for the Northern District of California"; and (ii) that the Board "cause Yelp to immediately file an amended answer in the Securities [Class] Action, and/or file a cross-complaint against [defendants] in the Securities [Class] Action, asserting claims for relief for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, contribution, indemnification and such other relief as the Board deems necessary to protect Yelp's interests against [defendants]."

20.    Over a year has passed since plaintiff issued the Demand to the Board.  The Board, however, has functionally ignored the Demand in violation of its fiduciary duties to the Company and its shareholders, and has failed to act.

21.    Upon receipt of a pre-suit demand from a shareholder, directors of Delaware corporations are duty-bound to investigate independently and in good faith and evaluate charges in order to discharge their fiduciary duties to stockholders and manage corporate affairs responsibly. The members of the Yelp Board, on the other hand, shortly after receipt of the Demand from plaintiff, via correspondence sent to plaintiff's counsel, attempted to condition any meaningful response to the Demand or consideration thereof on the receipt of proof of plaintiff's stock ownership.

22.    Although plaintiff was not required under Delaware law to provide proof of his ownership of Yelp stock in support of his Demand, plaintiff nonetheless did so.  Once plaintiff did so, however, in July 2019, the Board informed plaintiff's counsel that the "Board has decided to defer further substantive consideration of the Demand until the resolution of the [Securities Class Action]."  The Board has taken no action in connection with the Demand since.

23.    For over a year, the Demand has been treated by the Board with disdain and derision. Although legally bound to undertake an independent investigation in good faith and either accept or

reject the Demand, the Board has instead chosen to do nothing.  The Board has functionally ignored the Demand for over a year, and this derivative action should therefore proceed.

24.      The fact remains that, but for defendants' false and misleading statements, the Company would not have been named as a primary defendant in the Securities Class Action.  A corporation is a legal entity and, therefore, it can only act through its officers – here, defendants.  Under these circumstances, the Board's disdain and disregard for the Demand constitutes a constructive, wrongful Demand refusal.  Therefore, by this derivative action, plaintiff seeks to vindicate the Company's rights against its wayward fiduciaries – defendants – since the Company's current directors either cannot or will not discharge their fiduciary duties to protect and preserve Yelp's corporate assets.

## JURISDICTION AND VENUE

25.      This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

26.      In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

27.      The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

28.      Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Yelp maintains its principal place of business in this District; (ii) one or more of the defendants

1  either reside in or maintain executive offices in this District; (iii) a substantial portion of the

2  transactions and wrongs complained of herein, including the defendants' primary participation in the

3  wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties

4  owed to Yelp, occurred in this District; and (iv) defendants have received substantial compensation

5

6  in this District by doing business here and engaging in numerous activities that had an effect in this

7  District.

8                                **INTRADISTRICT ASSIGNMENT**

9         29.    A substantial part of the events or omissions which give rise to the claims in this

10  action occurred in the county of San Francisco, and as such this action is properly assigned to the

11  San Francisco division of this Court.

12                                        **THE PARTIES**

13        30.    Plaintiff is and continuously has been a shareholder of Yelp since at least 2015.

14

15        31.    Nominal defendant Yelp is a Delaware corporation with its principal executive offices

16  located in San Francisco, California.  According to its public filings, Yelp is a local business review

17  site in the United States, offering consumers unmatched local business information, and businesses

18  the opportunity to connect with customers.  Yelp's stock trades on the New York Stock Exchange

19  under the ticker symbol "YELP."

20        32.    Defendant Jeremy Stoppelman co-founded the Company in 2004.  Stoppelman is, and

21  was at all relevant times, the Chief Executive Officer ("CEO") of Yelp as well as a member of its

22  Board.

23

24        33.    Defendant Charles "Lanny" Baker served as the Chief Financial Officer ("CFO") of

25  Yelp from May 2016 until September 2019.

26        34.    Defendant Joseph R. "Jed" Nachman joined Yelp in 2007 and has served in various

27  capacities since then.  Since August 2016, defendant Nachman has served as the Company's Chief

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 8 -

Operating Officer ("COO"), after previously serving as the Company's Chief Revenue Officer ("CRO") from January 2016 to August 2016, its Senior Vice President of Revenue from September 2011 to January 2016, and as Vice President of Sales from January 2007 to September 2011.

### THE FIDUCIARY DUTIES OF YELP'S DIRECTORS AND OFFICERS

35.     As officers of a Delaware corporation, defendants owed the Company fiduciary duties of care, candor, loyalty and good faith.  These are among the highest duties known to the law.  As the Delaware Supreme Court explained in *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009), the "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and . . . the fiduciary duties of officers are the same as those of directors."  The officers of a Delaware corporation are "expected to pursue the best interests of the company in good faith (*i.e.*, to fulfill their duty of loyalty) and to use the amount of care that a reasonably prudent person would use in similar circumstances (*i.e.*, to fulfill their duty of care)."  *Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at *35 (Del. Ch. July 12, 2010).

36.     Moreover, "[u]nlike directors, corporate officers cannot be shielded from personal liability by 8 *Del. C.* §102(b)(7), which permits a corporation to offer such protection to directors in a corporate charter."  *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *43; *Chen v. Howard-Anderson*, 87 A.3d 648, 686-87 (Del. Ch. 2014) (holding "the Exculpatory Provision [under §102(b)(7)] does not protect [the CEO] when acting in his officer capacity").

37.     Instead, under Delaware law, corporate officers "face a statutory exposure to liability that is often greater than directors."  *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *43; *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 780-81 (Del. Ch. 2016) (holding that officers owe fiduciary duties identical to those of directors, but adding that officers are also "agents who report to the board of directors" and "have a duty to provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles").

38.     Here, defendants served as the principal executive officers of Yelp during 2016 and 2017.  Specifically, defendant Stoppelman served as CEO and a director of Yelp, while defendant Baker served as CFO, and defendant Nachman served as CRO from January 2016 until August 2016, and as COO thereafter.

39.     Therefore, unlike directors, defendants "cannot be shielded from personal liability by 8 *Del. C.* §102(b)(7)," but rather "can be held liable in damages to [Yelp] if they acted with gross negligence and caused injury to the corporation."  *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *43-*44.

40.     As detailed below, defendants breached their fiduciary duties of care and loyalty to Yelp by making materially false and misleading statements about the purported success of the Company's business and advertising model and its prospects for future revenue and earnings growth.

41.     Defendant Stoppelman further breached his fiduciary duty of loyalty by selling Yelp shares at artificially inflated prices while he, but not the market, was aware of non-public adverse information, reaping over $25 million in proceeds.

42.     Additionally, as a part of their duties of care and loyalty, defendants had a fiduciary duty to disclose all material information whenever they voluntarily chose to speak to Yelp shareholders, or the market generally, about the business of the corporation.  *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("'Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading.'"); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances"); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("[D]irectors are under a fiduciary obligation to avoid misleading partial disclosures.  The law of partial disclosure

is likewise clear: 'Once defendants travel[] down the road of partial disclosure . . . they . . . [have] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events.'"); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding the defendants breached their fiduciary duty of candor when they failed to disclose material information to minority shareholders to whom they owed a fiduciary duty).

43.     As the Delaware Supreme Court explained in *In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10-*11 (Del. Ch. Aug. 15, 2007):

> When . . . directors communicate with shareholders, they also must do so with **complete candor**.
>
>         Loyalty.  Good faith.  Independence.  Candor.  These are words pregnant with obligation.  The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.  It is against these standards, and in this spirit, that the alleged actions of spring-loading or backdating should be judged.

44.     These strict disclosure obligations apply to defendants, as officers of a Delaware corporation, with equal force.  *Gantler*, 965 A.2d at 709; *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *34-*35.

45.     Moreover, with respect to the insider sales made by defendant Stoppelman, it is black-letter Delaware law that "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests."  *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939).  Where corporate officers and directors: (i) are in possession of material non-public company information, and (ii) use that information in making stock sales that are motivated, in whole or in part, by the substance of that information, they have breached their non-exculpable fiduciary duty of loyalty.  *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

**SUBSTANTIVE ALLEGATIONS**

**Background of the Company and the Transition from CPM to CPC**

46.     Yelp is an online review platform for consumers to share their everyday local business experiences with other consumers by posting reviews, tips, photos and videos, and to engage directly with businesses.  The Company allows businesses to register a business account for free and "claim" the Yelp business listing page for each of their locations, allowing them to provide additional information about their business and respond to reviews, among other features. Businesses can pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business listing pages.

47.     The Company had 121 million cumulative reviews through 2016.  The reviews, ratings, tips, photos and videos drive traffic to the platform, which in turn indicates the Company's ability to deliver clicks and ad impressions to advertisers.  Defendant Baker noted at the November 9, 2016 RBC Technology Internet Media and Telecommunications Conference that review content had grown 30% and the growth of photographs was double that, and "that's a core part of our business."

48.     The Company earns revenue from its advertising products, transactions and other services.  As of December 31, 2016, the Company recognized approximately 90% of its revenue from approximately 135,000 paying advertising accounts, yet there were approximately 3.4 million claimed businesses on the platform, which the Company saw as a massive opportunity for growth.

49.     The Company began a transition from charging advertisers on a CPM basis to a CPC basis in 2015.  CPM advertisers pay a predetermined amount for every 1,000 ad impressions, meaning that the publisher is paid for every advertisement shown regardless of whether it generates a click.  Every visitor to the site earns the publisher money; therefore, if a publisher can predict traffic, they can predict revenues.

50.     CPC advertising means the advertiser pays each time one of its ads is clicked on, and the advertiser is therefore paying for visitors sent to its site from the publisher's site.  Publishers who can provide a targeted audience for an advertiser's message are thought to have greater earning potential using CPC advertising.  Publishers have full visibility into revenue generated, since they are able to track and record clicks.  CPC appeals to more advertisers because they only pay for clicks, allowing them to control costs and track their return on investment ("ROI").  The risk with CPC is if the ads do not succeed at driving clicks, they very quickly will be sidelined and will stop receiving impressions.  Thus, ads that produce truly high customer engagement perform better in the CPC model because they are more likely to drive clicks, whereas ads with less engagement do not perform well.

51.     Despite emphasizing the positive effects of the switch to CPC on retention, defendants knew that many of the Company's advertisers had low levels of engagement on the platform.  These advertisers were not likely to renew their contracts and, thus, would impact retention rates negatively.

**Defendants Emphasized Impressive Growth in 2016**

52.     Following a somewhat disappointing year in 2015, the Company entered 2016 with a substantially larger, yet less experienced, salesforce.  By the fourth quarter of 2015, Yelp had increased its salesforce by 45% over the prior year.  Robert J. Krolik ("Mr. Krolik"), Yelp's then-CFO, noted at the December 3, 2015 Credit Suisse Tech, Media, and Telecom Conference that the Company had "the highest percentage of rookies tha[t] we have ever had as a total of our sales population."  The Company also changed its commission sales curve, so that new sales associates would start earning commissions in less time in order to improve salesforce retention.

53.     On May 5, 2016, the Company held an earnings conference call to discuss its financial results for the first quarter of 2016, using the opportunity to assure investors that both its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

revenue and retention were growing.  During that call, defendant Stoppelman stated: "We had a great start to the year with local revenue growth accelerating to 40% year-over-year, driven by the continued strength of our recurring revenue base, as well as better-than-expected ad budget fulfillment and strong sales team approach."  Mr. Krolik noted: "Local advertising accounts grew 34% year-over-year to approximately 121,000.  A portion of the new advertising accounts came through our self-serve channel where we experimented with promotions that we don't necessarily plan to repeat in subsequent quarters."

54.     A large portion of the local revenue growth was due to businesses attracted to Yelp by various promotional offers.  A significant percentage of these businesses, however, were low engagement.  Such businesses were substantially less likely to realize benefits from advertising with Yelp and were thus far less likely to remain with Yelp after the expiration of their initial contracts.

55.     Defendants continued to cite local revenue growth and improved retention despite the coming advertiser churn in the first quarter of 2017.  For example, on an August 9, 2016 earnings conference call, defendant Stoppelman reported:

> Second-quarter results were strong, highlighted by local revenue growth accelerating to 41% year over year.  Revenue exceeded our expectations, driven by upside across all sales channels, as well as slightly better-than-expected revenue retention.  That revenue outperformance helped grow adjusted EBITDA by 24% year over year, even as we invested for the long-term.  And based on these results we are increasing our outlook for the year.

56.     On November 2, 2016, the Company held an earnings conference call to discuss its financial results for the third quarter of 2016, in which defendant Stoppelman stated: "Third-quarter results were strong.  We maintained our first-half momentum, generating record levels of both revenue and adjusted EBITDA, even while investing to fuel long-term growth."

57.     Analysts were excited about the Company's improved retention.  For example, a November 2, 2016 Cantor Fitzgerald report stated:

> We remain constructive on YELP and are raising our ests and PT to $46 from $42 on the back of a third quarter in a row of robust ad growth.  Strong execution across

local, national and self-serve sales channels and better revenue retention prompted
mgt, once again, to raise its FY16 outlook, implying sustained momentum, and no
visible adverse impact from Google's latest algo[rithm] change (as some feared).

**Defendants Were Focused on the Retention Rate of Advertisers**

58.     Because of the importance of recurring revenue to the Company's bottom line, the

defendants reported and frequently discussed retention and the importance of demonstrating a return

on investment (or ROI) to retaining customers.  Defendants repeatedly indicated that they monitored

and were aware of retention rates, which were of substantial importance to Yelp's financial

performance and revenue growth.

59.     For example, at the May 25, 2016 J.P. Morgan Global Technology, Media and

Telecom Conference, defendant Baker stated that "we've got to make sure that our advertising

products are delivering verifiable value to the customers, and they're aware of it going in, and they

see it once they buy it."  Defendant Baker also noted that the Company carefully measured the

impact of advertising and noted the importance of advertisers curating their presence on Yelp:

> [Unidentified audience member:]  One thing that was always hard maybe
> with the CPM model or in general is just helping the advertisers understand their
> ROI.  Like, when Google was growing it was always so super clear, you could tell
> where.
>
> What kind of metrics do you have or can you share about your advertisers'
> ROI on this form of advertising, and advertiser churn, and stuff like that?
>
> [Baker:]  Well, the first thing when we talk about efficacy of advertising is it
> has to have an impact first.  You could have an advertising product that drives 350%
> ROI, and if that means that the establishment sells one more ice cream cone, they
> don't really care.
>
> You have to – it has to have a scale impact on driving the business.  ***So that's
> something we measure really carefully, which is: Do you feel customers coming to
> your business because of your advertising on Yelp***?
>
> Once you get them over that hump, and they believe in that and they start to
> do their marketing spend and activities with Yelp and their curation of their store
> presence on Yelp as a really important part of their marketing, then naturally the
> conversation starts to shift toward: Well, what's the return, and should I invest more
> in this than I have invested in the past?

*. . . [F]or those who are advertising for a few hundred dollars of advertising a month, the lead volume we're driving to those businesses is off the charts*.[3]

60.     On the earnings conference call for the second quarter of 2016, defendant Baker addressed an analyst's question regarding increasing repeat rate and the Company's visibility into future revenues.  Defendant Baker represented that the Company has a "good amount of visibility" going into a quarter and that the Company's efforts to communicate with businesses were all contributing to improved retention:

> And, really, one of the things, I'm trying to do as I've come into the Company and have a rare opportunity to seek with fresh eyes about what I see inside this business. One of the things that really is notable to me is that, I think sometimes there is a perception that there's a lot of in and out, over and over through our revenue base. And when you actually look at it, there's quite a bit of predictability and visibility.
>
> We have a lot of one-year annual contracts.  We have a lot less than one year, but multi-month contracts.  *We have a really big volume of people who are coming through the self-serve channel and committing to business.  And that gives us quite a bit of mobility.  So, we go into the quarter with a pretty good amount of visibility, as I said*.
>
> *I don't think that's wildly different than – I'm not trying to note that that is higher or lower or moving up or down relative to the history*, I'm just saying, that's a fact of this business, that I think is an important one that allows us to be thinking about a little bit – much further out frankly than just the current quarter, or next quarter.

61.     On the earnings conference call for the second quarter of 2016, defendant Nachman also noted: "As you would imagine, as folks get towards that month 12, there is a natural customer attrition, *although we continue to make improvements in that area*."

62.     On the earnings conference call for the third quarter of 2016, defendants again stated that Yelp had expanded its local client partner team to retain and upsell advertisers, and on the product side, Request-A-Quote and the business owner's app were helping businesses see their ROI. Defendant Nachman noted that the Company could see the engagement of advertisers on the business owner's app and it was continuing to get stronger:

---

[3]   Emphasis is added unless otherwise noted.

Yes, hi, Matt.  In terms of our retention efforts, we've always been focused on **retention, and certainly there are initiatives in place right now** on the product side, on the marketing side, and on the human being side to generally have a great experience for our customers.

Specifically, we have a small team right now, what we call local [clan] partners.  Their job is to up-sell within that category.  It's a small team now that we're going to be expanding over the coming quarters, and we're starting to see some initial signs that that has a nice impact on what we're doing.

And then on the product side, we continue to focus on improvements that will help businesses see the value in Yelp and stay with Yelp over the long term.  And so things like RaQ, make a service and servicing of the metrics of the business owners' app, **and you can see that engagement that's happening on the business owners' app as it continues to get stronger**.  So that's pretty much the color on the retention side.

**Defendants' False and Misleading Statements in February and March 2017**

63.     On February 9, 2017, defendants issued the Company's 2017 guidance, stating:

- For the full year of 2017, net revenue is expected to be in the range of $880 million to $900 million, representing growth of approximately 25% compared to full year 2016 at the midpoint of the range.  Adjusted EBITDA is expected to be in the range of $150 million to $165 million.  Stock-based compensation is expected to be in the range of $110 million to $112 million, and depreciation and amortization is expected to be approximately 4.5% to 5% of revenue.

64.     On the same day, defendants held a conference call with investors, analysts and the public to discuss the Company's financial results for the fourth quarter of 2016 and financial guidance for 2017.

65.     In the February 9, 2017 press release and conference call, defendants concealed that in late 2016 through February 2017, Yelp was experiencing weak revenue retention in its local advertising business.  In fact, at the start of 2017, overall local revenue churn was at the upper end of the range that Yelp had normally seen and was especially pronounced among the group of advertisers added in the first quarter of 2016.

66.     During the February 9, 2017 earnings conference call, defendant Stoppelman stated:

Increasing awareness and engagement was another important goal for 2016 and we saw great results.  Our ad campaigns drove awareness and familiarity to their highest levels, and reached over 200 million consumers on television and online.

On the product side, [servicing] the best content and providing actionable suggestions and reminders contributed to a more engaging user experience. Our ad campaign and focus on product helped propel Yelp into the top 30 in Apples App Store by the end of the year, with app unique devices up 25% and page use per user growing approximately 20% compared to 2015.

Executing well on these priorities sets Yelp up for continued growth in 2017 and we're excited about the potential we see in the year ahead.

67.    During this same conference call, defendant Baker represented that nothing had structurally changed about the Company's business:

[Mark Mahaney:]  Okay.  Just one question then on the – in terms of the margin guidance for 2017, would you say there's anything structurally changed in the business, or are these mostly elective investments, particularly in the product development.  And I guess, what I'm trying to tease out, has some of the areas really built out transactions, for example?  Does that have a sustainably dilutive impact on the profitability margins of the business?  Thank you.

[Baker:]  Sure, Mark.  *I don't think there's anything structurally changing in the business*.  We had kind of a 30%-plus incremental profitability in 2016, which I think is the best in four or five years for the Company, and you saw in the second half, the incremental profitability north of 50%, even while the revenue is grown pretty well.

So we were, in a year in which we were increasing our brand spend in 2016, a year in which we're walking away from brand advertising revenue dollars, and showed that kind of leverage.  And I think that's inherent, and unchanged in the model.

68.    In response to a question about "local active accounts," defendant Nachman stated:

So on the local account side, certainly, we're happy with the revenue side of the equation in Q4.  You look at things like an accelerating national business, self-serve being up 100% year-over-year.

If I were to point to a weakness and a slowness, it's potentially around kind of the local salesforce in the fourth quarter.  And particularly, it was a modest slowdown that – quite frankly, we think the election and a period around the election, both from an output and productivity perspective from the salesforce, and that kind of bled into vacation time.  *It's not something where we're super concerned about kind of coming into 2017, and feel like the fundamentals are in place and really strong*.

69.    Similarly, defendants Stoppelman and Baker responded to a question about "local advertisers that do not [continue their] relationship with Yelp" during that same February 9, 2017 conference call:

[Stan Velikov:]  Hi, good afternoon.  This is Stan Velikov for Brian.  Thank you for taking my question.  We have seen that repeat rates keep increasing, actually

it looks like it hit an all-time high.  But still from those local advertisers that do not [continue their] relationship with Yelp, what do you hear as the most common reason for that?

[Stoppelman:]  I can take that one.  On the repeat rate, obviously, repeat rate is a mix of folks who have advertised with us in the past, *and that's at an all-time high right now.  And while, we're really encouraged by our kind of strong, embedded client base, and that's a really kind of healthy number to understand that those folks are coming back*, it's double-edged sword, because we also think that making sure that we get enough new clients into the pipeline is a really important initiative for the Company.

*And so, we're not alarmed in any way, about where we are in the repeat rate side*, but you'd love to see – again, adding the number of local advertising accounts.  Even if we were up in the 7,000, 8,000, 10,000 range, based on the opportunity that we actually have in this marketplace, with millions of businesses that have claimed their presence on Yelp, we think we're still in the very early stages.  And we've got to look at both sides of the coin here, making sure that we're driving new business, and *taking advantage of kind of the existing client base that has very nice trends behind it*.

[Stoppelman:]  But I think, from stuff that we have seen in terms of advertiser's sentiment about Yelp products, it's funny, that the reason that people stay with us for three and four and five years, is the same reason that another advertiser might decide to stay with us for three or four or five weeks.  And that is, they all ask the question of, am I seeing a return on the advertising?

And we've got 80% of them who are saying, I am repeating because I see the value.  And we've got another chunk who we haven't yet documented well enough for them, the value of the Yelp advertising.  And we're working on that from a product perspective all the time.

70.     The guidance defendants provided on February 9, 2017 did not take into account the substantial weakness in retention Yelp was experiencing in late 2016 and January 2017.  Defendants' failure to do so rendered the guidance materially false and misleading because, as defendants would later admit, retention of advertisers after the expiration of the term of the initial contract has a major impact over the course of a forward 12-month period.  If retention is weaker than anticipated at the start of the year, revenues from those advertisers will be missing, even though they were included in Yelp's plan for the full year.  Effectively, defendants' revenue guidance for 2017 included revenue from a substantial number of advertisers that were not renewing contracts at a higher than expected/planned rate, including contracts that had already not been renewed in January 2017.

71.    Defendants continued to issue false and misleading statements about Yelp's financial prospects, advertising retention, and revenue rates on February 14, 2017 during the Goldman Sachs Technology and Internet Conference.  At that conference, defendant Baker answered an analyst's question about strong growth in local advertising revenue in 2016, stating: "I think it really was just about focusing on the core, and that's what the message that was delivered to the teams at the start of the year.  Hey, there is nothing fundamentally wrong with our business, *we just need to execute even better.  And so, we really did that and I think it paid off*."

72.    Further, in response to an analyst's question about Yelp's 2017 guidance, defendant Stoppelman stated:

> [Analyst:]  Yes, so just wanted to tie – the EBITDA flow-through was really high, especially in the second half.  But when you guided for EBITDA in 2017, the leverage there was below what many of us were kind of expecting.  Just wondering where we're – you touched on this a little bit – but where we're investing?  Why it's so important for the revenue growth and then why sales and marketing has to grow above – or at or above the revenue growth?
>
> *            *            *
>
> [Stoppelman:]  On the sales side, I think we continue to want to grow our local sales team and expand that at a double-digit clip this year.  *That's a fairly proven model that we feel we're pretty good at operating*.  We like the returns in that business.  They tend to be predictable over time.

73.    The statements by defendants referenced above were materially false and/or misleading because they failed to disclose that the Company was experiencing a material number of contract terminations in January 2017 among a cohort of less engaged advertisers added in the first quarter of 2016 who saw less ROI and, as a result, the Company was entering 2017 with a smaller book of business and less-than-forecasted recurring revenues, which would negatively impact its growth projections for 2017.

74.    On March 1, 2017, the Company filed its 2016 annual report on Form 10-K with the SEC.  The Company's 2016 10-K was signed by defendants Baker and Stoppelman.  In relevant part, the 2016 10-K stated:

*Ability to Attract and Retain Advertisers.* Our revenue growth is driven by our ability to attract and retain local business that purchase our advertising products. Our largest sales and marketing expenses consist of the costs associated with acquiring advertisers. We spent a majority of our sales and marketing expense for 2016 on initiatives related to advertiser acquisition and expect to continue to expend significant amounts to attract additional advertisers. At the same time, our advertising agreements increasingly provide for performance-based cost-per-click payment terms, which may make it more difficult to forecast advertising revenue accurately. In addition, our advertisers typically do not have long-term obligations to purchase our products, and their decisions to renew depend on the degree of satisfaction with our products as well as a number of factors that are outside of our control, including their ability to continue their operations and spending levels. The small and medium-sized businesses on which we heavily rely often have limited advertising budgets and may be disproportionately affected by economic downturns. As a result, a worsening economic outlook would likely cause businesses to decrease investments in advertising, which could adversely affect our revenue.

75.     The 2016 10-K further stated:

Advertising revenue increased $173.8 million, or 37%, in 2016 compared to 2015, and $136.0 million, or 41% in 2015 compared to 2014. The increase in both periods was primarily due to a significant increase in the number of customers purchasing advertising plans as we expanded our salesforce to reach more businesses. The growth in both periods was driven primarily by purchases of cost-per-click advertising.

76.     On March 1, 2017, at the Morgan Stanley Technology, Media & Telecom Conference, defendant Nachman discussed the Company's retention, stating:

And then you also look at our existing client base as well. And so from a – really focusing on retention and upsell and the [LCT] group has kind of shown that that's a really – we've been surely focused on acquisition for kind of a very long time, and we've got a really strong client base that's recurring, and they love our product. And you look at things like [Request-a-Quote] and I know we'll get into it a little bit, but really promising looking forward.

77.     Defendants Baker and Nachman also addressed a question from an analyst about the impact of the Company's transition to CPC:

[Analyst:] Now that you've transitioned the monetization to CPC ads, how sensitive is your revenue growth going forward to the usage of the platform?

[Baker:] Well, it's a lot more sensitive to it than it was in the past. And so, in particularly some high value categories where the advertisers are super jazzed to get Yelp leads, there is an ability to drive traffic there and really have an impact on revenue. So the model is much more responsive to traffic than it has been in the past.

We're at a place today where with 24 million monthly active users of the app and 138,000 advertisers at the end of the last quarter, we've got a lot more users and a lot more usage than we do advertiser demand and interest and budget right now. So the reality is although the model is more responsive, we're not at a place where if we had a lot more usage kind of sprinkled all across [Y]elp, it probably wouldn't

drive a big change in the short term in the financial components.  Does that make sense?  Basically, what I'm saying is we've got a lot of inventory relative to the level of usage that we have.

[Nachman:]  From a budget perspective, I think the way to think about that is, you know, on the $300 advertisers, it effectively performs the same way that a CPM product did from a fulfillment and how much budget can you get out of that $300.  You know, there's some marginal differences depending on categories, but we're not in a situation where somebody is delivering a 25% when it would have been 100% at the CPM level.

78.   Further, in response to an analyst's question regarding the Company's 2017 margin guidance, defendant Baker stated:

I think that from a margin perspective, we're trying to do a couple really important things this year.  We are really dedicated to advancing the transactional capabilities, functionalities, flows, and experiences within our product for both consumers and for businesses.  I'll come back and talk about that in a second.

And we're building a brand new capability that Yelp hasn't had around performance marketing.  Let me stop on that one for a second.

*     *     *

And as the business moves in that transactional direction, you could have all the salespeople you want, but you have to stimulate or you have opportunity to stimulate consumer activity, and our salespeople aren't calling up consumers saying, hey, use Yelp, they're calling businesses.  And so our marketing dynamic is starting to get more involved around bringing customers back and bringing customers into and bringing them throughout the Yelp experience for all of these transactional elements.

There's another whole element of what we're doing that – so there's an investment there around building performance marketing activity to stimulate usage as the business becomes one where there are more transactional turnstiles, bringing customers through those turnstiles.

*     *     *

So it's really about making product and marketing investments at a heartier clip than we made them in the second half of last year.  Second half of last year, in which 50% of the revenue growth dropped down to the bottom line, gives an indication of the margin and leverage that's inherent in the business, *but the revenue opportunity that sits out there with 3 million claimed businesses and only 140,000 paid advertisers really merits the investment activity that would – we think merits the investment activity on the product and marketing side that we're making this year*.

So things kind of see-saw back and forth.  *Last year was – there was a[n] acceleration in revenue growth in 2016*, an acceleration in investment activity in 2017, and I think that's all part of the long-term plan.

79.     Defendants' statements referenced above were materially false and/or misleading because they failed to disclose that a cohort of less engaged advertisers added in the first quarter of 2016, as the Company transitioned to CPC, did not see a material benefit and were unsatisfied with the return on the advertising, and as a result: (i) the Company had experienced a material number contract terminations in January and February of 2017, when this cohort's annual contracts expired; (ii) the Company had implemented a team to improve engagement and retention among this cohort, (iii) the Company put measures into place to make sure its salesforce was no longer calling on these less engaged businesses to sell ads; and (iv) the Company had not factored this smaller book of business and loss of recurring revenues into its 2017 guidance, which would have a material impact on revenues and margins.

80.     Defendants' unlawful scheme continued unabated until May 2017.  Then, on May 9, 2017, defendants caused the Company to issue a press release announcing Yelp's financial results for the first quarter of 2017.  In the press release, defendants revealed that the Company would dramatically lower its 2017 financial guidance from a range of $880-$900 million to a range of $850-$865 million.  The press release also lowered projected adjusted EBITDA from a range of $150-$165 million to a range of $130-$145 million.  Defendants attributed the Company's substantial decline in revenues and adjusted EBITDA to advertiser churn in the first quarter of 2017.

81.     On this news, Yelp's stock price collapsed by 18%, falling from $34.70 per share to $28.33 on May 10, 2017, wiping out more than $500 million in shareholder equity.

82.     Worse yet, defendants knew that their February 9, 2017, February 14, 2017, and March 1, 2017 statements were false and misleading at the time they made those statements, because their own statements show they were aware of the advertiser churn issues by late 2016 and into early 2017.

83.     For example, at a June 7, 2016 Stifel Technology, Internet & Media Conference, defendant Baker stated that Yelp was keenly focused on monitoring and retaining the record number of advertisers added in the first quarter of 2016:

> [W]e've done a bunch of promotions, started this year and we're doing these all the time.  But we did a little bit bigger ones where we said, hey, we will spot you $200 of advertising or $300 of advertising.  And that, you could see, we had a record number of new customer additions in the Company's history in the first quarter this year.
>
> So clearly we're learning some stuff there.  On the other hand, if you're given away advertising you should have a pretty good number.  But what we're really trying to do is get people to sample and trial and get experience with the Yelp platform and *we'll be watching how those people renew and how we follow up with them to make sure they become a long time customers of ours going forward*.

84.     Similarly, during Yelp's February 9, 2017 earnings conference call, defendant Nachman stated:

> So on the local accounts side, certainly we're happy with the revenue side of the equation in Q4.  You look at things like an accelerating national business, self-serve being up 100% year-over year.
>
> *If I were to point to a weakness and a slowness, it's potentially around kind of the local salesforce in the fourth quarter*.  And particularly, it was a modest slow down . . . .

85.     During the Company's May 9, 2017 conference call with analysts and investors regarding Yelp's financial results and lowered 2017 guidance, defendant Nachman conceded that most of the retention problems had occurred before February 2017 and that they had recognized the advertiser churn rate halfway through the first quarter of 2016.  In fact, the problem was so significant that defendants called for "all hands on deck" to fix the problem.  According to defendant Nachman:

> So we recognize[d] the churn issue about halfway through the quarter and we're able to tie it back actually to a distinct cohort of advertisers that came on Yelp about a year ago as we are making the transition from CPM to CPC.  We saw that there were different retention characteristics amongst that cohort, more emerging businesses on Yelp that had trouble competing in the ad system with some of the more established businesses.  It's all hands on deck, obviously, at that point and we put a team in place to focus on that particular cohort and that particular profile, and we're able to really course-correct in a pretty short period of time and saw progressively better results as we got into March and particularly in April.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                              - 24 -

86.     Defendant Nachman went on to state that the Company had put measures in place in January and February 2017 in order to ensure that Yelp's salesforce was contacting the right clients:

> [Lloyd Walmsley:]  Two if I can.  First, just like digging into some of the attrition issues and the fixes you guys have put in place.  Is that mostly a function of just the specific cohort, and 1Q is different from how you acquired your customers for the rest of the year?  Or is it more a function of fixes you've made to people coming in from those sort of channels you feel like are sustainable? Any color you can give there would be helpful. . . .

> [Nachman:]  Sure.  This is Jed.  I'll take that, Lloyd.  So specifically, as it relates to the retention issue, it was concentrated, obviously, in a cohort that surfaced around the beginning of last year.  When we made the transition from CPM to CPC, there was certainly a learning curve in terms of how people sold the product and there are, in fact, some other pockets of folks that we couldn't approach before, just based on the product that folks went out and kind of got right there initially when the CPC product was released.  We recognize that and upstream have put things in place in order to make sure that our sales reps' upstream work were calling on the right clients.  ***And we addressed this kind of acute problem in January and February***.  We put this recovery team on higher response rates, put a lot of focus on that particular cohort and the numbers have kind of spoken for themselves as we've gotten into March and April.

**Defendant Stoppelman's Suspicious Insider Stock Sales**

87.     Defendant Stoppelman, in breach of his non-exculpable fiduciary duty of loyalty, used his knowledge of material adverse inside information – that Yelp was experiencing lower advertiser retention rates due to the change from CPM to CPC and reduced user engagement – to profit by selling his personally held Yelp stock at artificially inflated prices.  By doing so, defendant Stoppelman reaped millions of dollars in illegal insider trading proceeds.

88.     Defendant Stoppelman's insider trading was suspicious in both time and amount.  For example, from July 16, 2015 until September 28, 2016, Stoppelman did not sell any Yelp stock.  On September 29, 2016, however, Stoppelman began selling his personally held Yelp shares in 13,000 share increments.  Stoppelman made nine such sales of Yelp stock between September 29, 2016 and February 7, 2017.

89.     Then, after learning that Yelp's advertising churn rate was much higher than expected and that the Company was facing a substantially declining retention rate, defendant Stoppelman began selling his Yelp shares in increments of over 200,000 shares.

90.     Specifically, on February 16, 2017, defendant Stoppelman sold over 235,000 shares of Yelp stock for more than $8.2 million in proceeds.  Defendant Stoppelman next sold 250,000 shares on each of March 3, 2017 and March 15, 2017, for total proceeds of more than $16.8 million.  Then, immediately after revealing the truth regarding Yelp's declining retention rate to investors, defendant Stoppelman returned to selling shares in increments of 13,000 shares for the rest of 2017 and into 2018.

91.     Defendant Stoppelman's suspicious insider trading activity is depicted on the following chart, which reflects Stoppelman's trades from January 1, 2016 through December 20, 2018:

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 29-Sep-16 | $41.52 | 13,000 | $539,760 |
| 4-Oct-16 | $41.53 | 13,000 | $539,890 |
| 27-Dec-16 | $40.00 | 13,000 | $520,000 |
| 5-Jan-17 | $40.00 | 13,000 | $520,000 |
| 12-Jan-17 | $40.43 | 13,000 | $525,590 |
| 17-Jan-17 | $40.32 | 13,000 | $524,160 |
| 25-Jan-17 | $42.58 | 13,000 | $553,540 |
| 2-Feb-17 | $42.98 | 13,000 | $558,740 |
| 7-Feb-17 | $41.93 | 13,000 | $545,090 |
| 16-Feb-17 | $35.10 | 235,142 | $8,253,484 |
| 16-Feb-17 | $35.69 | 14,858 | $530,282 |
| 3-Mar-17 | $33.68 | 250,000 | $8,420,000 |
| 15-Mar-17 | $33.74 | 250,000 | $8,435,000 |
| 4-Aug-17 | $40.00 | 13,000 | $520,000 |
| 10-Aug-17 | $41.05 | 13,000 | $533,650 |
| 15-Aug-17 | $41.74 | 13,000 | $542,620 |
| 23-Aug-17 | $41.94 | 13,000 | $545,220 |
| 31-Aug-17 | $43.31 | 10,000 | $433,100 |
| 1-Sep-17 | $42.61 | 3,000 | $127,830 |
| 5-Sep-17 | $42.62 | 13,000 | $554,060 |
| 13-Sep-17 | $43.54 | 13,000 | $566,020 |
| 21-Sep-17 | $43.49 | 13,000 | $565,370 |
| 26-Sep-17 | $42.20 | 13,000 | $548,600 |
| 4-Oct-17 | $45.38 | 13,000 | $589,940 |
| 12-Oct-17 | $43.66 | 13,000 | $567,580 |
| 17-Oct-17 | $43.50 | 13,000 | $565,500 |
| 25-Oct-17 | $43.94 | 13,000 | $571,220 |
| 2-Nov-17 | $45.96 | 3,500 | $160,860 |
| 2-Nov-17 | $47.45 | 500 | $23,725 |

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 2-Nov-17 | $46.79 | 9,000 | $421,110 |
| 7-Nov-17 | $45.58 | 13,000 | $592,540 |
| 15-Nov-17 | $45.40 | 13,000 | $590,200 |
| 24-Nov-17 | $47.59 | 13,000 | $618,670 |
| 28-Nov-17 | $47.49 | 13,000 | $617,370 |
| 6-Dec-17 | $42.61 | 13,000 | $553,930 |
| 14-Dec-17 | $42.32 | 13,000 | $550,160 |
| 19-Dec-17 | $43.69 | 13,000 | $567,970 |
| 27-Dec-17 | $42.14 | 13,000 | $547,820 |
| 4-Jan-18 | $43.23 | 13,000 | $561,990 |
| 9-Jan-18 | $43.63 | 13,000 | $567,190 |
| 17-Jan-18 | $43.48 | 13,000 | $565,240 |
| 25-Jan-18 | $42.67 | 13,000 | $554,710 |
| 30-Jan-18 | $43.63 | 13,000 | $567,190 |
| 7-Feb-18 | $44.37 | 13,000 | $576,810 |
| 15-Feb-18 | $40.94 | 11,900 | $487,186 |
| 15-Feb-18 | $41.75 | 1,100 | $45,925 |
| 20-Feb-18 | $41.84 | 13,000 | $543,920 |
| 7-Jun-18 | $41.88 | 13,000 | $544,440 |
| 12-Jun-18 | $42.08 | 13,000 | $547,040 |
| 20-Jun-18 | $42.15 | 13,000 | $547,950 |
| 5-Jul-18 | $40.00 | 13,000 | $520,000 |
| 12-Jul-18 | $40.00 | 13,000 | $520,000 |
| 19-Jul-18 | $40.40 | 13,000 | $525,200 |
| 26-Jul-18 | $40.00 | 13,000 | $520,000 |
| 9-Aug-18 | $44.00 | 13,000 | $572,000 |
| 14-Aug-18 | $47.00 | 13,000 | $611,000 |
| 22-Aug-18 | $44.11 | 13,000 | $573,430 |
| 30-Aug-18 | $46.98 | 13,000 | $610,740 |
| 4-Sep-18 | $46.84 | 13,000 | $608,920 |
| 12-Sep-18 | $44.69 | 12,890 | $576,054 |
| 12-Sep-18 | $45.31 | 110 | $4,984 |
| 20-Sep-18 | $50.15 | 6,900 | $346,035 |
| 20-Sep-18 | $49.30 | 6,100 | $300,730 |
| 25-Sep-18 | $49.66 | 13,000 | $645,580 |
| 3-Oct-18 | $47.24 | 13,000 | $614,120 |
| 11-Oct-18 | $41.73 | 3,600 | $150,228 |
| 11-Oct-18 | $42.47 | 9,400 | $399,218 |
| 16-Oct-18 | $43.19 | 12,299 | $531,194 |
| 16-Oct-18 | $43.75 | 701 | $30,669 |
| 24-Oct-18 | $42.73 | 13,000 | $555,490 |
| 1-Nov-18 | $43.05 | 13,000 | $559,650 |
| 6-Nov-18 | $43.98 | 13,000 | $571,740 |
| | | **1,530,000** | **$59,397,174** |

92.     Defendant Stoppelman's insider sales were suspicious in both their timing and amount.  Between February 16, 2017 and March 15, 2017, defendant Stoppelman sold 750,000 shares of Yelp stock and was rewarded with over $25.6 million in illicit insider sales proceeds.

### THE SECURITIES CLASS ACTION IS SUSTAINED

93.     As a result of the above-referenced conduct, in January 2018, Yelp, Stoppelman, Baker, and Nachman were named as defendants in the Securities Class Action, which remains pending before this Court.  The Securities Class Action alleges violation of §§10(b) and 20(a) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder, during the Class Period.  The Securities Class Action specifically challenges defendants' public statements on February 9, 2017, February 14, 2017, and March 1, 2017, as well as defendant Stoppelman's insider stock sales during the Class Period.

94.     On November 27, 2018, the Honorable Edward M. Chen ("Judge Chen") denied (in part) defendants' motion to dismiss the Securities Class Action.  In sustaining the Securities Class Action, Judge Chen concluded that it had been adequately alleged that certain of the public statements issued by defendants on February 9, 2017, February 14, 2017, and March 1, 2017 were materially false and misleading.

95.     Among other things, Judge Chen concluded that certain of defendants' February 9, 2017 statements, in which they failed to disclose Yelp's churn problems, created an impression of a state of affairs that differed materially from the one that actually existed, and that this omission was material, "[g]iven the importance of local advertising revenue to Yelp's financial health." *Azar v. Yelp, Inc.*, No. 18-cv-00400 EMC, 2018 U.S. Dist. LEXIS 200769, at *36-*37 (N.D. Cal. Nov. 27, 2018).

96.     Judge Chen further found that defendants' February 14, 2017 statements touting Yelp's local advertising model as sustainable and "'fairly proven'" likewise created an impression of

1   a state of affairs that differed materially from the one that actually existed, given that these

2   statements also omitted any mention of churn issues. *Id*. at *40.

3           97.     And, with respect to certain of defendants' March 1, 2017 statements, Judge Chen

4   found that they "paint[] a promising picture wherein increased investment in Yelp's advertising

5   program would lead to revenue growth based on past results, without disclosing the risk that growth

6   could be limited by the sensitivity of the CPC model to low user engagement, and indeed that the

7   touted 'acceleration in revenue growth in 2016' was already showing signs of being short-lived." *Id*.

8   at *45-*46.  Thus, Judge Chen concluded that these statements too created an impression of a state

9   of affairs that differed materially from the one that actually existed.

10          98.     Judge Chen further concluded that defendants' own statements regarding when they

11  became aware of the churn issues, defendant Stoppelman's insider stock sales during the Class

12  Period, and allegations that local advertising is a "core operation" for Yelp gave rise to a strong

13  inference of scienter on the part of all of the defendants. *Id*. at *63-*64.  Stated another way, this

14  Court found there was *indicia* that defendants perpetrated a scheme to defraud during the Class

15  Period.

16          99.     More specifically, with respect to defendants' own statements indicating their

17  awareness of Yelp's churn issues, including their statements on February 9, 2017 and May 9, 2017

18  alluding to specific times they became aware of churn issues in late 2016 and early 2017, Judge

19  Chen ruled that "it is fair to conclude that Defendants 'had reasonable grounds to believe material

20  facts [about the churn issues] existed' when they attested to Yelp's 'strong, embedded client base'

21  that was renewing in 'healthy number[s]' on February 9, 'fairly proven model' for local advertising

22  on February 14, and belief in the value of continuing investments in local advertising on March 1."

23  *Id*. at *52.

100.    With respect to local advertising, Judge Chen concluded that the lead plaintiffs in the Securities Class Action had adequately alleged that the local advertiser program was "a central component of Yelp's operations that Defendants can be presumed to have knowledge of the problems within the program." *Id.* at *61.

101.    And, with respect to defendant Stoppelman's challenged insider sales of Yelp stock during the Class Period, Judge Chen found that Stoppelman's sales were "inconsistent" with his prior trading patterns considering their large size.

## DAMAGES TO YELP

102.    As alleged above, the statements and events described herein gave rise to the Securities Class Action being initiated against the Company.  The Securities Class Action was sustained (in part) in November 2018, and Judge Chen's Order in this regard presages great damages to Yelp's assets, goodwill, and reputation.

103.    Yelp has suffered additional damages as well.  For example, Yelp is suffering, and will continue to suffer, from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Yelp's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Further, as the Securities Class Action and other related litigation unfold, Yelp will continue to be damaged by the professional fees, costs and expenses incurred because of those matters, not to mention the decline in productivity associated with the distractions that come with exposure to litigation.

104.    Defendants have not fared nearly so badly, however.  On the contrary, defendants have pocketed at least $13 million in compensation not justified by the Company's performance while under their stewardship, in addition to the more than $25 million in illegal insider trading proceeds reaped by defendant Stoppelman.   Nonetheless, as alleged herein, the Board has

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

demonstrated an unwillingness to bring legal action against the defendants who are responsible for this debacle.

## THE BOARD'S DISDAIN FOR THE
## PLAINTIFF'S LITIGATION DEMAND

105.    Plaintiff incorporates ¶¶1-104.

106.    Yelp is a Delaware corporation.  It is axiomatic that the directors of a Delaware corporation owe the corporation and its stockholders "'an affirmative duty to protect the interests of the corporation.'"  *Pfeiffer v. Toll*, 989 A.2d 683, 695 n.3 (Del. Ch. 2010) (quoting 1 Edward P. Welch et al., *Folk on Delaware General Corporation Law* §141.2.1.2, at GCL-IV-26 (5th ed. 2006)). Moreover, Delaware directors have "'an obligation to refrain from conduct that would injure the corporation and its stockholders.'"  *Id.*

107.    As the Delaware Supreme Court recognized in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985), the directors of a Delaware corporation must "protect the corporate enterprise . . . from harm reasonably perceived, irrespective of its source."  Here, the source of the harm to the Company arises from the multi-million-dollar damages claims that investors have asserted against Yelp based largely, if not entirely, upon the alleged false and misleading statements made by defendants, as well as the associated litigation costs, expenses and fees.  On November 27, 2018, this Court sustained (in part) the claims for securities fraud against Yelp and the defendants, based on defendants' false and misleading statements.

108.    Yelp's damage claims against the defendants are corporate assets that the Board has an obligation to protect and preserve. *Nagy v. Bistricer*, 770 A.2d 43, 55-56 & n.23 (Del. Ch. 2000) (finding breach of fiduciary duty claims are assets of a company); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 548 (Del. Ch. 2015).  However, despite plaintiff's formal March 11, 2019 Demand, the Board has not taken steps to protect and preserve the Company's valuable claims

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, or contribution and indemnification against defendants.

109.    On March 11, 2019, plaintiff issued the formal written pre-suit Demand to the Board under Delaware law.  Therein, plaintiff demanded that Yelp, acting by and through its Board, take critical steps to preserve and protect the Company's valuable claims against defendants. Specifically, plaintiff demanded: (i) that "the Board cause Yelp to file a Complaint for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, and aiding and abetting breaches of fiduciary duties, contribution and indemnification against [defendants] in the United States District Court for the Northern District of California"; and (ii) that "the Board cause Yelp to immediately file an amended answer in the Securities [Class] Action, and/or file a cross-complaint against [defendants] in the Securities [Class] Action, asserting claims for relief for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, contribution, indemnification and such other relief as the Board deems necessary to protect Yelp's interests against the [defendants]."

110.    Over a year has passed since plaintiff issued the Demand to the Board.  The Board, however, has functionally ignored the Demand in violation of its fiduciary duties to the Company and its shareholders, and has failed to act.

111.    Upon receipt of a pre-suit demand from a shareholder, directors of Delaware corporations are duty-bound to investigate independently and in good faith and evaluate the charges in order to discharge their fiduciary duties to stockholders and manage corporate affairs responsibly. The members of the Yelp Board, on the other hand, shortly after receipt of the Demand from plaintiff, via correspondence sent to plaintiff's counsel, attempted to condition any meaningful response to the Demand or consideration thereof on the receipt of proof of plaintiff's stock ownership.

112.    Although plaintiff was not required under Delaware law to provide proof of his Yelp stock ownership in support of his Demand, plaintiff nonetheless did so.  Once plaintiff did so, however, in June 2019, the Board informed plaintiff's counsel that the "Board has decided to defer further substantive consideration of the Demand until the resolution of the [Securities Class Action]."  The Board has taken no action in connection with the Demand since.

113.    For over a year, the Demand has been treated by the Board with disdain and derision.  Although legally bound to undertake an independent investigation in good faith and either accept or reject the Demand, the Board has instead chosen to do nothing.  The Board has functionally ignored the Demand for over a year, and this derivative action should therefore proceed.

114.    The Board's conduct is antithetical to its affirmative duty to protect the interests of Yelp and to refrain from conduct that would injure the corporation.  By failing to act upon the Demand, the Board has failed in its "fundamental duty and obligation to protect the corporate enterprise." *Unocal*, 493 A.2d at 954.  Therefore, by virtue of its own actions, the Board has refused the Demand.  Accordingly, plaintiff may proceed with this derivative action designed to protect the interests of Yelp vis-à-vis the defendants by, among other things, perfecting the Company's claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, contribution and indemnification, and related damages against defendants.

## COUNT I

### For Breach of Fiduciary Duty
### Against All Defendants

115.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.    As Yelp's top officers and/or directors, defendants owed Yelp and its shareholders fiduciary duties of loyalty, candor and good faith – the highest duties known to the law.  Rather than speak the entire truth when they said, or caused anything to be said, about the Company, defendants

breached their fiduciary duties by disseminating false and misleading statements about the Company's advertising revenue.

117.    As a result of defendants' fiduciary failures, Yelp has been damaged.

118.    Plaintiff, on behalf of Yelp, has no adequate remedy at law.

**COUNT II**

**For Unjust Enrichment
Against All Defendants**

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Yelp.

121.    All the payments and benefits provided to defendants were at the expense of Yelp. The Company received no benefit from these payments.

122.    Plaintiff, on behalf of Yelp, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

123.    Plaintiff, on behalf of Yelp, has no adequate remedy at law.

**COUNT III**

**Against All Defendants for
Aiding and Abetting Breaches of Fiduciary Duty**

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    Defendants Stoppelman, Baker, and Nachman, and each of them, agreed to and did aid and abet one another in the unlawful and disloyal misconduct detailed herein, in breach of their fiduciary duties of care and loyalty owed to Yelp and its shareholders.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 34 -

126.   In doing so, defendants Stoppelman, Baker, and Nachman engaged in unlawful self-dealing and put their personal interests ahead of the best interests of Yelp.  In particular, defendants Stoppelman, Baker, and Nachman failed to exercise the care required and breached their duties of loyalty, good faith, candor and independence by failing to disclose material information and/or made material misrepresentations to shareholders regarding the purported success of the Company's business and advertising model and its prospects for future revenue and earnings growth.

127.   By reason of the foregoing acts, practices and course of conduct, defendants Stoppelman, Baker, and Nachman have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Yelp.

128.   As a result of defendants' aiding and abetting one another in their breaches of fiduciary duties owed to Yelp, Yelp has suffered millions of dollars in damages, injuries and losses.

129.   Plaintiff, on behalf of Yelp, has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Contribution Under §§10(b) and 21D of the Exchange Act

130.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein

131.   This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Stoppelman, Baker, and Nachman, each of whom is a named defendant in the Securities Class Action.

132.   Yelp is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, among other things, violation of §10(b) of the Exchange Act.  If Yelp is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of defendants Stoppelman, Baker, and Nachman, as alleged herein.  The Company is entitled to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 35 -

receive contribution from those defendants in connection with the Securities Class Action against the Company.

133.    As directors and/or officers of Yelp, defendants Stoppelman, Baker, and Nachman had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about Yelp, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

134.    Defendants Stoppelman, Baker, and Nachman are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

135.    Accordingly, Yelp is entitled to all appropriate contribution or indemnification from defendants Stoppelman, Baker, and Nachman, who are responsible for exposing Yelp to liability under the federal securities laws.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.    Against defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty and unjust enrichment;

B.    Directing Yelp to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Yelp and its shareholders from a repetition of the damaging events described herein;

1    C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and the

2    state statutory provisions sued hereunder, including attaching, impounding and imposing a

3    constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their

4    other assets so as to assure that plaintiff on behalf of Yelp has an effective remedy;

5
6    D.      Awarding to Yelp restitution from defendants, and each of them, including ordering

7    disgorgement of all profits, benefits and other compensation obtained by defendants;

8    E.      Awarding plaintiff the costs and disbursements of the action, including reasonable

9    attorneys' fees, accountants' and experts' fees, costs and expenses; and

10   F.      Granting such other and further relief as the Court deems just and proper.

11                                    **JURY DEMAND**

12   Plaintiff demands a trial by jury.

13   DATED:  April 21, 2020                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
14                                             SHAWN A. WILLIAMS

15

16                                                  *s/ Shawn A. Williams*
17                                             SHAWN A. WILLIAMS

18                                             Post Montgomery Center
                                               One Montgomery Street, Suite 1800
19                                             San Francisco, CA  94104
                                               Telephone:  415/288-4545
20                                             415/288-4534 (fax)
                                               shawnw@rgrdlaw.com
21
                                               ROBBINS GELLER RUDMAN
22                                               & DOWD LLP
                                               TRAVIS E. DOWNS III
23                                             BENNY C. GOODMAN, III
                                               ERIK W. LUEDEKE
24                                             655 West Broadway, Suite 1900
                                               San Diego, CA  92101
25                                             Telephone:  619/231-1058
                                               619/231-7423 (fax)
26                                             travisd@rgrdlaw.com
                                               bennyg@rgrdlaw.com
27                                             eluedeke@rgrdlaw.com

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                          - 37 -

1

2          SHUMAN, GLENN & STECKER
           KIP B. SHUMAN
3          100 Pine Street, Suite 1250
           San Francisco, CA  94101
4          Telephone:  303/861-3003
           303/536-7849 (fax)
5          kip@shumanlawfirm.com

6          SHUMAN, GLENN & STECKER
           RUSTY E. GLENN
7          600 17th Street, Suite 2800 South
           Denver, CO  80202
8          Telephone:  303/861-3003
           303/536-7849 (fax)
9          rusty@shumanlawfirm.com

10         SHUMAN, GLENN & STECKER
           BRETT D. STECKER
11         326 W. Lancaster Avenue
           Ardmore, PA  19003
12         Telephone:  303/861-3003
           303/536-7849 (fax)
13         brett@shumanlawfirm.com

14         Attorneys for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Yelp, Inc. Verification

I, Nicholas R. Ingrao, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint For Breach of Fiduciary Duty, Aiding and Abetting Breaches of Fiduciary Duty, Unjust Enrichment and Violation of the Federal Securities Laws (the "Complaint"), and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 4/14/2020

Nicholas R. Ingrao